The next case is number 06-1507, In Re Sullivan. Mr. Green, when you're ready. Please report. Lawrence Green for the appellants. This appeal relates to an anti-venom composition that uses fab fragments for neutralizing the lethality of rattlesnake venom. I'd like to point out that this is a particular clause in the claim, the where-in clause that appears at the end of the claim. And this where-in clause states, wherein said anti-venom pharmaceutical composition neutralizes the lethality of the venom of a snake of the Corvallis genus. Now this where-in clause does not state that the anti-venom composition is capable of neutralizing the lethality of the venom. It doesn't state that it neutralizes the venom. It states that it neutralizes the lethality of the venom. And it's not a statement of intended use. All characterization is used in the director's brief. Rather, as the board has stated quite clearly, this is a functional limitation that requires that the composition have the property of neutralizing the lethality of the venom of a snake of the Corvallis genus. Now after recognizing that this was a limitation that must be dealt with in the claim, the board inexplicably went on to hold that one of ordinary skill in the art would be expected by a person of ordinary skill in the art at the time the invention was made to neutralize the lethality of the venom of a snake of the Corvallis genus. Mr. Green, you have two tough references against you here, which doesn't sound like you're addressing. One is Coulter, and the other is Sullivan. Sullivan has full, I guess, rattlesnake antibody, and Coulter has a related fab fragment. Why isn't there a perfectly sound obviousness projection there? Well, that's what the board has suggested. Your Honor, Coulter is a reference that teaches detecting venom, and it detects a single venom in a particular rattlesnake, or not a rattlesnake venom, a brown snake venom. As we had pointed out in our brief, one of ordinary skill in the art believed at the time this invention was made that the fab fragments which were used to neutralize the lethality of the rattlesnake venom, because it was believed that the fab fragments would in fact ferry these toxins that are in the venom to points of high blood flow where they would be concentrated and actually increase the lethality. So that if one were making an anti-venom, one would never have looked to the teachings of Coulter, because Coulter taught the use of fab fragments and a conventional understanding at that time was that such fab fragments would not neutralize the lethality of the venom. Are those the assertions in the declaration that wasn't considered? Yes. Why wasn't it considered? I don't know, Your Honor. I was just going to get to that. The board went on to hold that we have this expectation, and yet never once referred to these declarations. And I The only reference they made to the declarations were on the previous page in footnote 7 where they indicated that with regard to the preamble, they weren't going to consider them because they didn't think that these declarations and this evidence were relevant to a consideration of the preamble. We don't take issue with that. What we take issue with is they should have been considered in conjunction with this particular limitation, and they weren't. And we submit, Your Honor, this is clear error. We submit also that had they been considered, it would have been clear that one of ordinary skill in the art would not have expected that this combination would neutralize the lethality of the venom. But are you saying that the fab fragments then enhance the toxicity rather than decreasing it? That was the expectation. Now, as it turned out, the understanding of one of ordinary skill in the art at that time period was incorrect. In fact, the inventors were ultimately able to make an anti-venom that did remove these toxins from the system. You have to understand that there's more to neutralizing lethality than simply binding the toxins with the fab fragments. Neutralizing lethality requires removal of all the toxins from the system. And if you don't do that, if you simply bind, you could have this taxi effect where these toxins are deposited in these high blood flow areas, so this would increase the lethality. But that was not shown until 1987, though, wasn't it? It wasn't known until 1987 that in fact it would neutralize the lethality, or at a much later time, anyway, when the inventors finally were able to generate some evidence of that. But at the time the application was filed in 1984, the conventional understanding was that it would not neutralize the lethality. Some of the other reasons, the other beliefs were that this is a dynamic process, that the fab fragments bind and release, bind and release, and so it's not like they bind and then the job is done. And these fab fragments were believed to be removable from the body very quickly, much more quickly than the venom would be removed, and so that the venom would remain behind and the fab fragments would be all gone. And another concern was that in the prior art, they had some fab 2 fragments where the entire antibody, which had both arms of the Y present, and it added an additional binding site, and it was felt that that would permit some cross-linking, which would enhance the effect, and it would be lost if you just simply had the fab fragments, which are just simply the single arms of the Y, not both arms at the same time. So that was the belief of one of Winnery's skill in the art at the time, and we can't explain that. Isn't the combination of the Sullivan and the Coulter references, don't they teach neutralization? They teach... Or suggest it? They teach that if you premix the venom and the fab fragment and then inject it into a mouse, there would be no effect on the mouse. But it was also understood in that particular period of time that that premixing step was not predictive of how the actual treatment of snakebite would occur in the human body, that if you premix it, you might get a very different result than if the venom were already there because of the snakebite, and then these fab fragments were then introduced at a later time. And so it was believed that that was not predictive of how this would work in the human body. The other thing you have to understand, too, is that Coulter only dealt with a single toxin. In fab fragments, there are 20 or more toxins, maybe up to 100. Nobody really knows how many toxins. And while the assay that Coulter used was fine for a single toxin, there's no evidence that it would, in fact, have worked for a whole cocktail of toxins like this, where the logistics of trying to figure out what toxins were in there and the quantity, when you have 20 or 100 different toxins, if you used a single assay, it's just insurmountable, and Coulter provided no guidance as to how one would do that. So if one were combining Coulter with Sullivan, we would submit that what you would probably do is prepare an assay for a single toxin, and that, of course, clearly would not neutralize the lethality of the rattlesnake, because there would be 20 or 30 other toxins in there that wouldn't be neutralized. But was there any evidence that it would not have worked in these other applications? That the Coulter product would not have worked? Yes. There was no experimental evidence that it would not have worked. Well, there was an experimental evidence, not with the Coulter assay, but with other products that there were some experiments run with other toxins in other situations where bad results were achieved, where, in fact, the lethality was not neutralized and the lethality was increased with other toxins, not with either rattlesnake or the brown snake toxins, but with other toxins. And it did suggest that because of the large size of the toxin, that such fab fragments would not be suitable for neutralizing the lethality. So this experimental evidence was available in other publications which were cited in those affidavits. So, yes, there was, clearly was a teaching away at that time from this thing of actual work. Now, the director has tried to support this finding on an alternative basis, recognizing that there was a lack of support in the record for this particular finding. One basis that the director has suggested that this finding could be supported is inherency theory. Now, we submit that that doesn't work either for a number of reasons. One of them is that inherency, I think there's no question in law, and this is unaffected by KSR, that obviousness cannot be predicated on what is not known in the art at the time the invention is made. Even if this feature turns out to be inherent through later discovery. So here we have a situation where it was believed at the time, believed by one of ordinary skill at the time, that these fab fragments would in fact not work. And certainly then there was no basis for believing for one of ordinary skill in the art to have an expectation at that particular period of time that these fab fragments would work to neutralize the lethality. So we believe that that inherency argument fails. The other reason that it fails, another reason is that it seems to us it was predicated on a misconstruction of the claim. Now, the board never construed these claims, but neutralizing the lethality, in our view, clearly means more than just simply binding. It means that, again, as I suggested, it means removing the entire, all our interpretation of that term clearly would have been no expectation based on the evidence of record, the evidence which the board did not consider. This is made clear not only by the claim language, but by the specification itself. The specification talks about the test for determining the lethality. It looks to see whether the mouse died. If the mouse died, it was lethal. If the mouse didn't die, then it neutralized the lethality. There's no discussion of whether it bound or didn't bind or whatever else happened. It's a very simple test. They gave enough to kill the mouse, and if the mouse survived, then it neutralized the lethality. Also, if you look at the claim itself, too, if the claim is read simply that the neutralizing of lethality means nothing more than binding, that would render superfluous the earlier limitation which recites that these fab fragments bind specifically to a venom of a snake of the cotylus genus. That would be a superfluous limitation, and that is usually not an acceptable claim interpretation. The other theory that the government has put forth for supporting the board's decision is that the wearing clause can be simply ignored as not being a limitation. That, of course, is contrary to what the board found. The board found that it was a limitation of the claim. It's also contrary to any case law we found. The director didn't cite, and we've been unable to cite a single case where the wearing clause has been found not to be limiting. That also is logical from an English point of view. The wearing clause is an adverbial clause. Adverbial clause is, by nature, modified, limited. The director asserted that the wearing clauses were the same as whereby clauses, and cited a couple of cases where whereby clauses have been ignored. But a whereby clause is a conjunctive clause. It's a transitional word, and so by its nature it doesn't necessarily limit. Do we have to adjudicate the distinction between whereby and whereas clauses? I hope not, Your Honor. I would submit that there are other bases for reversing the board's decision, and one does not need to interpret those clauses. But I would just say that there's no support for that position. I just want to address briefly and reserve some time for rebuttal. You're into your rebuttal time, so do be brief. Good morning, Your Honors. May it please the Court. Substantial evidence supports the board's findings that the amendment made to the obvious composition of Claim 40 cannot render that clause neutral. And I'll start with the wear-in limitation. The board found in this case that a person of skill in the art would have expected the claimed composition to have neutralized the lethality of rattlesnake venom based upon the neutralization teachings that are found in both the Coulter and the Sullivan references. Why would you need the Coulter reference if it's shown strictly in the Sullivan? Sullivan teaches neutralization, doesn't it? Yes, Your Honor. Sullivan teaches that whole antibodies specific to a crotalis venom would neutralize crotalis venom. And then Coulter goes on to add to that teaching that fab fragments specific for a certain neurotoxin are able to neutralize that neurotoxin. So the board found that when read together, a person of skill in the art would have understood that if you took fab fragments that are specific to crotalis venom and that have been shown to neutralize crotalis venom and made using the methodology of Coulter, the fab fragments, then those fab fragments would have neutralized crotalis venom. So maybe there's a prima facie case, but why wasn't the declaration considered in rebuttal of the prima facie case? Respectfully, Your Honor, the board did consider the declarations, and they say so at page A13 in the record. They looked at the declarations, but they didn't accord them any weight. And the reason they didn't is because they felt that the declarations did not go to the composition as claimed, but instead went to the use of the composition. Well, I read the footnote as saying we have not placed weight, as you say, but we do not address these arguments or the declarations. So they didn't seem to consider the declaration and tell us why the assertions in the declaration, which say there were real problems and expectations as to why the fab fragment wouldn't work, doesn't seem to have been considered. Your Honor, in this case, we have to keep in mind that these are composition claims, not use claims. And all of the discussion in the declarations go to how the composition would be used. Why a person of skill in the art? It goes to the properties of the composition. The composition was novel, right? Pardon me, Your Honor? The composition was novel. Yes, Your Honor. Yes, the fab fragment was novel. And the question is, if it was prima facie obvious, why wasn't the declaration and the assertions in the declaration relevant and evaluated in determining whether the prima facie case was overcome? Because they assert that the fab fragments were successful in immunization, and it wasn't clear that they would be. Well, Your Honor, there is evidence in the Coulter reference that the statements made in the declaration were the opinions of experts, two of whom were the inventors in this case. They cannot refute the evidence in Coulter that teaches fab fragments were successful in neutralizing a specific neurotoxin. Fab fragment for a different, not for rattlesnake venom. That's correct, Your Honor. But there's been no evidence that the declarations didn't state that when you make a fab fragment from a whole antibody, where it was known in the art that the whole antibody was capable of neutralizing the venom, that then the fab fragment made from that whole antibody would itself not be capable of neutralizing the venom. Well, was the applicant told that this was something that needed to be remedied through evidence? There wasn't any contrary evidence. No, Your Honor, but the claims in this case have been in the works since 1990. The applicants here introduced composition claims since 1990, and the references, specifically Coulter and Sullivan, have been in place since 1994. The arguments about the effect of use of the composition versus the composition itself have been going back and forth before the examiner and the board for close to 14 years now. So the issues, they were not hiding the ball as to what their concerns were about why the claims were not patentable. Well, I think that's why it's surprising that at this stage with this history, the board nevertheless says we're not going to consider evidence that on its face is relevant. They might have thought it was not persuasive, but they didn't say that. That's correct, Your Honor, because again, the declarations in the board's view went to how the composition would be used rather than why the composition, fab fragments specific for Crotalus venom and free of the FC stem combined with a pharmaceutical carrier, would not have been offered. The declaration went to the properties of the product, whether it would work and be successful. I mean, you say how it would be used, but this is a composition claim, right? Yes, Your Honor. And so the declaration goes to the properties of the composition. And I believe that the board did speak to the properties of the composition when they discussed the wear and limitation and made their findings as to that limitation on page A14 of the board's second decision. There they said a person of skill in the art would have been motivated to combine Salter, or would have understood when you combine Salter and Sullivan that the composition that would have resulted would have been able to neutralize the lethality of rattlesnake venom. Hence, a prima facie case. Yes, Your Honor. Which leads to the declaration. Yes, I guess it's a catch-22, Your Honor. Moving on, I'd like to talk about the inherency theory that Counselor for the Appellant has raised in this case. No, he didn't raise it. He says it was raised for the first time in this argument, or by the board. Is that correct? That argument was made in the Director's Threadbrief in attempting to explain how the board reached its findings. The board didn't specifically make an inherency argument. I had understood that in reviewing a decision of an agency, it has to be reviewed on the basis of inherency, unlike reviewing the decision of a district court. That's exactly correct, Your Honor. But was this before the examiner? Did the examiner reject the claim on the basis of inherency? No, Your Honor. The examiner rejected the claim for the same reasons that the board rejected it. It is the board's rationale that's before you on review today. But I thought when the board raises a new ground of rejection, there's an obligation to remand and provide an opportunity for interaction and review other than before this court. Yes, Your Honor. And in this case, the board raised a new ground of rejection in its first decision, issuing a new record. Inherency? Was inherency raised in the first decision? No, Your Honor. That argument only came up in the Threadbrief in an attempt to explain the board's decision. That's not the basis of the board's rejection. That's a different ground, is it not? That was not the basis of the board's rejection. That was the explanation that's in the Threadbrief to explain the board's actions. Yes, Your Honor. And it can be disregarded because what we're focusing on is the rationale employed by the board in this case. Counselor for Appellant Tavolosi— Inherency was not a basis of rejection. No, Your Honor. It was not. By the board or anyone else. No, Your Honor. It was not. Now, Counselor for Appellant has also raised several references and tries to explain why those references—Falstitch, Sorgen, Balthazar—explain why fab fragments wouldn't have worked. All of those references are an opposite in this case. None of them dealt with neutralization by fab fragments of protalis venom. The Falstitch reference dealt with neutralization of alpha-amatoxin. That's a mushroom toxin. Balthazar and the Smith references, they dealt with neutralization of digoxin, a small molecule. And then finally, the last reference, Balthazar, it talked about neutralization—or Sorgen, I'm sorry—it talked about neutralization of viper venom. None of those are protalis venom. So any information that we have is not persuasive or teaches or explains how protalis venom would work, how fab fragments would work to neutralize protalis venom. And then the last point I'd like to make is that Counselor for Appellant discussed binding and binding not being equal to neutralization. Well, in this case, what happens scientifically is that when the fab fragment binds to its target, to the antigen, protalis venom, it immediately neutralizes the venom. What Counselor is referring to is properties of excretion. That's separate from binding. And as Counselor for Appellant told you, the binding process here is dynamic. The antigen and its target bind, release, bind, release. So each time binding occurs, there is neutralization happening. And for these reasons, if the Court has no further questions, I would present that the Board has satisfied its prima facie case of showing that the claim composition would have been obvious to a person of skill in the art. The amendments made thereafter cannot save the composition, are not rendering the composition patentable. And therefore, we would ask you to affirm the decision of the Board. I still don't think I've heard a good answer as to why the declaration wasn't considered and why it doesn't overcome the prima facie case. Because in this case, Your Honor, the Board found that the wear and limitation was satisfied based upon the neutralization teachings in Coulter and Sullivan. Therefore, there's nothing in those declarations that refute that prima facie finding. Therefore, whether maybe they didn't consider them, nevertheless, they didn't address Coulter and Sullivan. So any mistake by the Board on that part would really amount to harmless error. Okay. Any more questions? Thank you, Ms. Gandara. Thank you. I'd just like to mention a couple of points, Your Honor. The one toxin that I'm not sure exactly how it's pronounced, the hematoxin that was referenced in one of the articles, that's very similar to the toxins found in the venom of rattlesnakes and other snakes. And so one could reasonably draw some analogy from those. Which article was that? I'm not sure. I think that was the Paul Stitch article. If I could just check on that. The Paul Stitch article basically is premised upon information that's in 1987, not 1983. Even as late as 1987, it was believed that there would be problems with fat pregnancies even after the application was filed. But you needed to have information prior to 1983, right? We believe, Your Honor, that this was reflective of the state-of-the-art, or the belief at the time the application was filed as well as three years later, that it reflected what people felt at that time period. But that was published in 1987. Yes. So is that a valid rebuttal type of information? We submit that it was, Your Honor. This reflected work that had been done in earlier years around the 1984 time period and was a report of that work and thus reflected what one of the people of skill in the art felt at that time and later. But it was not published until 1987. That's correct. So you really can't go back and say, well, this was known public information in 1983. What we submitted that for was evidence of what people of skill in the art believed in that time period. You're correct that the actual experimental evidence that was contained in that article was not available to one of skill in the art in 1983. So it wouldn't show any neutralization aspects of FAB in 1983 at that time. That particular article would not have made that public. No, that's correct. I see my time is almost up. One other point I'd like to make is there was a waiver argument that's been made repeatedly by the director with regard to the findings in the first board decision. And I'd like to point out that the board in that decision made clear that should the appellants decide to go the route of filing, going back to ex parte prosecution, that that particular determination would not be final or be affirmed until the second appeal, which is where we are now. So that we would submit that there was no waiver, because the way that rule 196 was interpreted by the board at that particular time indicated that that particular new ground of rejection had not become final until if you went the route of ex parte prosecution again, rather than appealing at that point, and therefore wouldn't be right for appeal until the second appeal, which again is where we are now. So thank you for your time. OK. Thank you, Mr. Green. Ms. Gungor, the case is taken into session.